**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

**Kristin L. Boyson**

      **v.**                                   Case No. 09-cv-119-PB
                                      Opinion No. 2010 DNH 077

**Dartmouth Hitchcock Clinic**
**and Hartford Life and Accident**
**Insurance Company**

**MEMORANDUM AND ORDER**

     Kristin Boyson brings an Employee Retirement Income Security Act ("ERISA") action to recover benefits allegedly owed to her under the terms of a long-term disability policy provided by her former employer, Dartmouth Hitchcock Clinic ("DHC") through Hartford Life and Accident Insurance Company ("Hartford").  See 29 U.S.C. § 1132(a)(1)(B).  Both Boyson and Hartford have moved for judgment on the administrative record.  Because I find that Hartford's decision to deny Boyson's long-term disability benefits was reasonable, I grant Hartford's motion and deny Boyson's motion.

## I.   BACKGROUND[1]

Kristen Boyson was hired by DHC as a Health Information Tech II on January 17, 2000.  Admin. R. at 991.  As a DHC employee, Boyson participated in its "Standard Healthcare Contract Group Disability Plan," a long-term disability ("LTD") insurance policy originally underwritten by Continental Casualty Company ("CNA") and later purchased by Hartford.[2]  See id. at 1226-98.

### A.   The LTD Policy

Hartford's LTD policy extends to all DHC employees who work "full time," a minimum of 20 hours per week, for DHC.  See Admin. R. at 1245.  Eligible employees fall into one of two classes: Class 1, which extends to full-time PHD's, Presidents, CEOs, and Senior Administrators only, and Class 2, which encompasses all remaining employees.  As a Health Information Tech, Boyson falls

---

[1] The background facts are presented in detail in the parties' joint statement of material facts ("JSMF," Doc. No. 15) and summarized here.  Defendants have also filed a separate statement of material facts in dispute.  (See Doc. No. 16); LR 9.4(b).  I have not considered defendants' additional disputed facts, as they do not affect my analysis.

[2] Hartford entered into a stock purchase and administrative services agreement with CNA in 2003, through which it assumed all rights, duties and obligations of CNA with respect to the LTD policy at issue.  (JSMF, Doc. No. 15, at 7.)

into the latter of these two categories.  See id.; (JSMF, Doc. No. 15, at 1-2.)

Eligibility for LTD benefits for Class 2 employees under Hartford's policy is divided into two phases.  The first phase, Hartford's so-called "own occupation period," covers an Elimination Period of 180 days and the following 24 months.  An employee must be continuously disabled throughout the Elimination Period, which begins on the day that she becomes disabled, before she can receive benefits.  In phase one, an employee is considered "disabl[ed]" if she is "(1) continuously unable to perform the Material and Substantial Duties of [her] Regular Occupation and (2) not Gainfully Employed."  Admin. R. at 1246 (emphasis added).  The second phase, or "any occupation" period, applies after the employee's monthly benefit has been payable for 24 months.  An employee is considered "disabled" in phase two if she is "(1) continuously unable to engage in any occupation for which [she is] or become[s] qualified by education, training or experience, and (2) not Gainfully Employed."  Id. at 1246.

Hartford's policy is also subject to certain exclusions and limitations.  The policy does not cover, among other things, disability beyond 24 months following the Elimination Period that

is due to substance abuse, a mental disorder of any type, or a disorder that "primarily manifests itself with an employee's self-reported symptoms."  See id. at 1250.  With respect to these limitations and all other policy terms, "[t]he Administrator and other Plan fiduciaries have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to benefits in accordance with the plan."  Id. at 1258.  DHC is listed as the LTD plan administrator.[3]  Id. at 1258, 1281.  Hartford, as a plan fiduciary, is granted the authority to review and deny benefits claims.  See id. at 1259.

**B.   Boyson Applies for LTD Benefits**

On March 20, 2002, Boyson broke her right leg in five places and dislocated her right knee in a serious skiing accident, and underwent emergency surgery.  (Pl.'s Mem. in Supp. of Mot. for J. on the Admin. R., Doc. No. 19-1, at 1); Admin. R. at 963-64.

---

[3] Defendants argue that DHC has been improperly named as a defendant.  However, DHC concedes in the parties' joint statement of material facts that it is the "Plan Administrator" of the LTD policy, and further acknowledges that "[t]he proper party defendant in an action concerning ERISA benefits is the party that controls administration of the plan."  Terry v. Bayer Corp., 145 F.3d 28, 36 (1st Cir. 1998); (see JSMF, Doc. No. 15, at 1.) I note that defendants' argument appears to be without merit. I need not reach this issue, however, as I find in defendants' favor for other reasons.

Boyson submitted a claim to CNA for LTD benefits on November 20, 2002, accompanied by an Attending Physician's Statement in which her orthopedist, Dr. Douglas Goumas, indicated that Boyson had a right tibial plateau fracture that required surgery and rehabilitation.  Dr. Goumas noted that Boyson could continue working with some limitations, but should refrain from deep squatting for any long periods of time, and might "cont[inue] to have pain squatting" that would render her unable to return to the same type of work.  Admin. R. at 993-94.  CNA acknowledged Boyson's claim by letter on January 6, 2003 and conducted a telephone interview with Boyson.

On March 13, 2003, CNA denied Boyson's claim for LTD benefits on the basis of her medical records on file and the fact that Dr. Goumas had released her to return to work full-time with a 50 pound weight-lifting restriction in September 2002.[4]  See id. at 912.  Boyson requested a written explanation of the policy's long-term disability definition and a copy of Dr. Goumas' assessment, which CNA provided.  See id. at 902.

C.   **Hartford Grants Benefits for the "Own Occupation" Period**

---

[4] Boyson did return to work part time from September 16, 2002 through October 15, 2002, but ceased working on October 16, 2002 with complaints of pain.  Admin. R. at 909-13.

-5-

On April 9, 2003, Dr. Goumas submitted a letter to CNA that contradicted his previous determination that Boyson could return to work.  While Dr. Goumas acknowledged that he had previously released Boyson to full-time work with some limitations, he found upon review of the job description provided by DHC and further discussion with Boyson that she could not, in fact, perform the duties that her former position required.  Admin. R. at 898.  CNA then contacted Boyson by letter on June 30, 2003 to communicate its conclusion that she was unable to perform the duties of her own occupation of Health Information Tech II, but that she "[could] perform alternative work" as a receptionist, telephonic customer service clerk, or cashier with a sit/stand option.  The letter confirmed that Boyson would remain eligible for benefits for the 24 month "own occupation" period until September 15, 2004.  Id. at 881-82.  Boyson was informed that she, as a claimant "who [was] disabled only from [her] own occupation," was able to receive "a lump sum payment in lieu of monthly benefit checks," but she declined to accept the payout offer.  Id. at 129, 881-82 (emphasis added).  She was also informed that benefits would terminate at the culmination of the "own occupation" period on September 15, 2004 unless "additional

-6-

medical information was received that supported [the claim that Boyson] was unable to perform alternative work at this time." Id. at 120.

**D.   Hartford Extends Benefits into the "Any Occupation" Period**

On August 24, 2004, Hartford received a letter from Dr. Dennis Stepro, another of Boyson's treating orthopedists.  Dr. Stepro reported that Boyson would need to undergo surgery to remove screws from her tibia, but that "she would be able to perform full-time work which is primarily seated in nature, with the flexibility to stand when needed, that does not require lifting greater than 10 pounds . . . presuming there are no other medical problems which cause her any physical impairment." Admin. R. at 833.  Following Boyson's surgery on September 3, however, Dr. Stepro concluded that Boyson could not, in fact, perform work of this nature, and issued a Health Status Certificate on September 30, 2004 that listed Boyson as being "permanently and totally disabled from work."  Id. at 827-29. Hartford noted on October 19, 2004 that Boyson's benefits had been extended into the "any occupation" period while Hartford continued to investigate her status.  See id. at 100.

**E.   Hartford Notifies Boyson that Her Benefits Will Be Terminated**

On October 26, 2004, Hartford faxed a letter to Dr. Stepro that posed a series of questions regarding his evaluation of Boyson's ability to return to work.  Dr. Stepro failed to respond.  On November 1, 2004, Hartford referred Boyson's file to the Medical Advisory Group ("MAG") for review and informed Dr. Stepro that an Independent Peer Physician from MAG would contact him for further discussion regarding Boyson's functional abilities and limitations.  See Admin. R. at 99, 810.

Boyson contacted Hartford on November 8, 2004 and indicated that she had been hospitalized for attempted suicide.  See id. at 98.  Hartford then referred her file to Diane Baumbach, a Behavioral Health Case Manager ("BHCM") to determine whether Boyson was disabled due to a mental/nervous condition.  See id. at 97.  Baumbach conducted a telephone interview with Boyson on November 9, 2004, during which Boyson reported suicidal thoughts and depression as a result of medications that were prescribed following her accident.  Boyson explained that her depression began immediately after her accident, but that she was unaware that she needed to report to Hartford regarding a potential mental/nervous condition.  See id. at 94-96.  Baumbach then faxed a Functional Assessment Tool ("FAT") to each of Boyson's treating physicians.  See id. at 785-802.

-8-

On November 18, 2004, Hartford received a response from Dr. Stepro.  Dr. Stepro reiterated his previous conclusion that Boyson was "not able to perform work, even in a totally sedentary capacity."  Id. at 803-804.  In a separate response to Hartford's request that Dr. Stepro complete a FAT, he declined to list specific functional limitations, and instead concluded that Boyson was "permanently and totally disabled."  See id. at 771.  Dr. Quentin Turnbull, Boyson's treating psychiatrist, also responded to Hartford's FAT request, and noted that Boyson had suffered from a mental/nervous condition during the last two years that contributed to her physical impairment.  See id. at 767.  Hartford then performed a "vocational assessment" and determined that Boyson was "able to work based on her physical condition only but is still disabled from her mental condition."  Id. at 77-80.  A subsequent "functional assessment consultation" concluded that the information provided "[did] support that Boyson was disabled from a mental/nervous condition from [January 27, 2004] through [the current date]" and that Boyson was unlikely to return to work in the next six months.  The claims note also indicated that Boyson's policy had a 24-month limitation on benefits received due to a mental/nervous condition.  See id. at 76; Section I.A, supra.  On December 1,

2005, Hartford notified Boyson that her benefits would terminate on January 31, 2006 pursuant to the end of this 24-month mental/nervous condition period, and informed her that she had a right to appeal its decision. Id. at 175-76. Hartford received notice on February 8, 2005 that Boyson had been awarded Social Security benefits. Id. at 732-40.[5]

## F.   Boyson Appeals Hartford's Decision

On January 3, 2006, Hartford received Boyson's written request for appeal, which included a letter from Dr. Stepro stating that she was "extremely unlikely . . . to return to gainful employment" and "continue[d] to be permanently and totally disabled." Boyson also included her own statement, which cited her inability to walk without a cane or drive, along with Dr. Stepro's most recent office notes and work release. Id. at 654. Having reviewed this information, Hartford contacted Boyson

---

[5] I note that disability determinations made by the Social Security Administration may be considered, but are not binding on plan administrators making determinations under ERISA. Rossignol v. Liberty Life Assurance Co. of Boston, 2010 DNH 021, at 15 (citing Pari-Fasano v. ITT Hartford Life & Acc. Ins. Co., 230 F.3d 415, 420 (1st Cir. 2000)). While courts have, on occasion, cited contradictory social security determinations as evidence that a plan administrator's decision was arbitrary and capricious, see Metro. Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2347 (2008), Boyson does not argue that Hartford's decision to deny her LTD benefits is inconsistent with the Social Security Administration's decision to grant her disability benefits.

on January 1, 2006 to inform her that her claim was approved through January 31, 2006, and that a further liability determination would be made following her meeting with Dr. Stepro on January 24, 2006.  <u>See</u> <u>id.</u> at 59.

Hartford later contacted Boyson on June 2, 2006 to request that she complete a Claimant Questionnaire and have each of her treating physicians complete an Attending Physician's Statement.[6] <u>Id.</u> at 605.  That same day, Boyson informed Hartford that she would soon be hospitalized for anorexia.  Upon receipt of this information, Hartford decided to "extend benefits, wait for updated medicals and a completed claimant questionnaire, and follow up in 3 months for an update."  (JSMF, Doc. No. 15, at 18 (citing Admin. R. at 51).)

On September 27, 2006 Boyson submitted her Claimant Questionnaire, Dr. Stepro's completed Attending Physician's Statement, and additional medical records from Dr. Stepro's office.  <u>See</u> Admin. R. at 583-88, 590-91, 597-602.  A new office note from Dr. Stepro dated September 21, 2006 reported that

---

[6] Boyson's claim was presumably approved following her submission of documentation following her January 24, 2006 appointment with Dr. Stepro, as the record indicates that benefits were being extended at the time of Hartford's subsequent request for documentation in June 2006.  (<u>See</u> JSMF, Doc. No. 15, at 17-18.)

Boyson had developed chronic back pain as a result of working one day a week as a demonstrator for Wal-Mart, which required her to stand for six hours at a time with her weight entirely on her left leg.  See id. at 594-95.  Dr. Stepro's Attending Physician's Statement reiterated his conclusion that Boyson was "permanently disabled," as she was unable to stand, walk, sit, or drive for any length of time, and unable to push or carry more than 10 pounds.  See id. at 590-91.  Boyson's completed Claimant Questionnaire listed these same restrictions, but reported that she could help with laundry on the bottom floor of her apartment, carry groceries up to the third floor, attend appointments, and run short errands as needed.  Boyson also noted that she had taken a position handing out samples at Wal-Mart, but informed Hartford that she "inten[ded] to quit this job due to difficulty standing and difficulty driving long distance[s]."  Id. at 583-88, 575.

Hartford completed a functional assessment on October 9, 2006 on the basis of this documentation.  While the claims note conceded that Boyson continued to have "impairment to the right knee," it noted that "it would appear that [Boyson] is able to sit with option to change positions with minimal lifting," and that appropriate work options should be considered.  Id. at 45.

Hartford then contacted Dr. Stepro to discuss these options.  Dr. Stepro refused to communicate with Hartford until he had seen Boyson.  See id. at 39.  On December 1, 2006, Boyson sent Hartford a copy of Dr. Stepro's most recent office note, dated November 21, 2006.  The note concluded that Dr. Stepro "did not think [that Boyson could] be gainfully employed" given her chronic pain and fatigue.  See id. at 569-70.

G.    **Hartford Initiates Surveillance**

Hartford referred Boyson's claim to its Special Investigation Unit ("SIU") on March 26, 2007 for investigation and an in-person interview.  See id. at 35, 567.  On April 5, 2007, New England Risk Management initiated video surveillance of Boyson, and obtained videotaped documentation of Boyson conducting errands with her mother.  The videotape showed Boyson "bending into the motor vehicle several times and carrying two twelve packs of soda [while] displaying no outward signs of physical restriction or impairment."  Id. at 561-66. Investigator Barry Berger then contacted Boyson for an in-person interview.

When Berger met with Boyson on May 30, 2007, Boyson indicated that she was unaware that surveillance had been conducted, but identified herself as the person in the video.

-13-

<u>Id.</u> at 532.  Boyson initially characterized the surveillance as demonstrating her "normal level of activity," but later stated that the video captured an unusual amount of activity.  <u>Id.</u> at 533.  Boyson explained that the video depicted her taking a <u>short</u> walk to the drug store, and that she had ventured out to get food stamps because she had limited time to respond to a letter from the Department of Health and Human Services, and her mother, who was visiting for the week from Florida, could drive her.  Boyson questioned whether she was actually observed carrying two twelve-packs of soda into her home, but later conceded that she had done so when Berger re-played a portion of the videotape.  <u>See</u> <u>id.</u>

On August 31, 2007, Hartford sent the video, video summary, interview transcript, statements about Boyson's disability, and an estimation of Boyson's reserved functional abilities to each of her treating physicians.  Hartford provided its most recent functional assessment, which concluded that Boyson "[was] capable of physically performing in a full-time, sedentary-type functional capacity [that] require[d] intermittent periods of walking/standing and allow[ed] for full use of [her] upper extremities" as long as she would be able to change body position as needed, and would not be required to lift more than 10 pounds. <u>Id.</u> at 160-69.  Dr. Vijaya Upadrasta, Boyson's treating

-14-

internist, and Christine Toulouse, his physician's assistant, both agreed with Hartford's functional assessment.  See id. at 426, 430.

On September 19, 2007, Hartford referred Boyson's claim to Reliable Review Service for review by independent physicians. Id. at 414-15.  On October 3, 2007, Dr. Marcus Goldman, an independent psychiatrist, and Dr. William Andrews, an independent orthopedist, both submitted their reports.  After consulting with Dr. Turnbull and reviewing Boyson's record, Dr. Goldman determined that Boyson did not have any psychiatric restrictions or limitations.  See id. at 410.  Dr. Andrews similarly concluded that "from an orthopedic perspective, [Boyson could] perform sedentary duties."  Id. at 413.  Hartford conducted an Employability Analysis on the basis of this review, which identified eight sedentary, unskilled occupations that Boyson could perform.  Id. at 382.

## H.   **Hartford Terminates Benefits; Boyson Appeals**

On October 12, 2007, Hartford notified Boyson by letter that her claim for LTD benefits had been terminated.  Id. at 373-80. Boyson requested a copy of the video surveillance, and Boyson's counsel submitted her request for appeal.  Id. at 372, 368-69. Hartford acknowledged Boyson's request, and submitted the

relevant information from her claim file to counsel.  Id. at 367.

Boyson's counsel submitted additional information in support of her appeal on March 14, 2008, and argued that Hartford had failed to consider Boyson's fatigue, inability to concentrate, and the side effects of her medications when it terminated her LTD benefits.  Id. at 248.  Hartford acknowledged receipt of Boyson's appeal on March 25, 2008.

## I.   **Hartford Upholds its Benefits Termination**

Hartford referred Boyson's file to MES Solutions ("MES"), a medical consultant program, on April 23, 2008 for peer review and advised Boyson's counsel that her claim would be assessed.  On May 13, 2008, Hartford received the Peer Review Report of Dr. Kenneth Kopacz, an independent orthopedist retained by MES.  Dr. Kopacz noted that "based upon the available information, the only restriction for [Boyson] would be no frequent stair climbing or frequent bending," and concluded that Boyson "should be able to work full time, 5 days per week."  Id.  Kopacz also reported that, despite numerous attempts, he had been unable to contact Dr. Stepro to discuss his contrary analysis.

Hartford notified Boyson by letter on May 27, 2008 that it was upholding its decision to terminate her LTD benefits.  Id. at 335-37.  Boyson's counsel requested a copy of Dr. Kopacz's

assessment, which Hartford provided.  Id. at 229-30.  Having

exhausted her administrative remedies, Boyson then filed this

lawsuit on or about March 4, 2009.  Id. at 211.


## II.   **STANDARD OF REVIEW**

The standard of review in an ERISA case differs from that in

an ordinary civil case, where summary judgment is designed to

screen out cases that raise no trial-worthy issues.  See, e.g.,

Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir.

2005).  "In the ERISA context, summary judgment is merely a

vehicle for deciding the case[,]" in lieu of a trial.  Bard v.

Boston Shipping Ass'n, 471 F.3d 229, 235 (1st Cir. 2006).  Rather

than consider affidavits and other evidence submitted by the

parties, the court reviews the denial of ERISA benefits based

"solely on the administrative record," and neither party is

entitled to factual inferences in its favor.  Id.  Thus, "in a

very real sense, the district court sits more as an appellate

tribunal than as a trial court" in deciding whether to uphold the

administrative decision.  Leahy v. Raytheon Co., 315 F.3d 11, 18

(1st Cir. 2002).

Where, as here, an ERISA benefits plan gives its

administrator discretion to decide whether an employee is

-17-

eligible for benefits,[7] "the administrator's decision must be upheld unless it is arbitrary, capricious, or an abuse of discretion." Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan, 402 F.3d 67, 74 (1st Cir. 2005); see Conkright v. Frommert, No. 08-810, 2010 U.S. LEXIS 3479, at *7 (Apr. 21, 2010) ("an ERISA plan administrator with discretionary authority to interpret a plan is entitled to deference in exercising that discretion"); Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). This standard is "generous" to the administrator, but "is not a rubber stamp." Wallace v. Johnson & Johnson, 585 F.3d 11, 15 (1st Cir. 2009). The administrator's decision must be "reasoned and supported by substantial evidence." Medina v. Metro. Life Ins. Co., 588 F.3d 41, 45 (1st Cir. 2009). "Evidence is substantial if it is reasonably sufficient to support a conclusion." Stamp v. Metro. Life Ins. Co., 531 F.3d 84, 87 (1st Cir. 2008). "Evidence contrary to an administrator's decision does not make the decision unreasonable, provided substantial evidence supports the decision." Wright, 402 F.3d at 74.

---

[7] Both parties agree that Hartford has discretionary authority under the terms of its disability plan to determine an employee's eligibility for LTD benefits. (See Pl.'s Mem. in Supp. of Mot. for J. on the Admin. R., Doc. No. 19-1, at 8; Def.'s Mot. for J. on the Admin. R., Doc. No. 20, at 3.)

In ERISA cases, "often the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket."  Metro. Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2346 (2008).  This dual rule creates a structural conflict of interest.  The presence of such a conflict of interest, however, does not change the standard of review; rather, it  "should be weighed as a factor in determining whether there is an abuse of discretion."  Id. at 2350; see Cusson v. Liberty Life Assurance Co. of Boston, 592 F.3d 215, 224 (1st Cir. 2010); see also Denmark v. Liberty Life Assurance Co. of Boston, 566 F.3d 1, 9 (1st Cir. 2009).  "[U]nder certain circumstances, [that conflict can] be accorded extra weight in the court's analysis."  Cusson, 592 F.3d at 224.  "The conflict of interest at issue . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision."  Metro. Life Ins. Co., 128 S. Ct. at 2351; see also Cusson, 592 F.3d at 224.  On the other hand, "[i]t should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy."  Metro. Life Ins. Co., 128 S. Ct. at 2351.  The claimant "bears the burden of showing

-19-

that the conflict influenced [the administrator's] decision."
<u>Cusson</u>, 592 F.3d at 225.

### III.  <u>ANALYSIS</u>

Boyson argues that Hartford's decision to terminate her LTD
benefits after five years was arbitrary and capricious because
she was continuously "disabled" under the terms of Hartford's
policy.  Boyson argues that (1) there was no change in her
medical or vocational condition, (2) the record review conducted
by Reliable Review Service ("RRS") physicians was incomplete and
erroneous, (3) Hartford's decision to terminate her LTD benefits
was motivated by a conflict of interest, and (4) Hartford's
appeal process did not afford her file a full and fair review.
(<u>See</u> Pl.'s Mem. in Supp. of Mot. for J. on the Admin. R., Doc.
No. 19-1.)[8]  Hartford asserts that (1) Boyson bore the burden of

---

[8] Boyson also makes some vague allegations, found nowhere in
her complaint, that Hartford failed to consider her eligibility
for worksite modification benefits and vocational rehabilitation
services.  (<u>See</u> Pl.'s Mem. in Supp. of Mot. for J. on the Admin.
R., Doc. No. 19-1, at 16.)  First, as Hartford points out, its
policy does not require it to provide rehabilitative services,
and, in any event, Boyson never requested these services.  (<u>See</u>
Def.'s Mot. for J. on the Admin. R., Doc. No. 20, at 15 n. 3.)
Second, the "work incentive benefit" only applies to employees
who are both disabled and gainfully employed.  <u>See</u> Admin. R. at
1249.  As Boyson has failed to articulate how this argument
relates to her contention that Hartford's decision to terminate

proving her disability on a continuous basis under the terms of its policy and that it was under no obligation to demonstrate a change in her condition, (2) that its decision to terminate Boyson's LTD benefits was reasonable and supported by substantial evidence, (3) that its structural conflict of interest should not be accorded any additional weight in assessing the reasonableness of its determination, and (4) that its appeals process ensured that her file was given a fair and complete review.  (See Def.'s Mot. for J. on the Admin. R., Doc. No. 20.)

## A.   Change in Condition

Boyson contends that because there was no change in her medical or vocational condition, Hartford's decision to terminate her LTD benefits after extending those benefits for five years was unfounded.  (See Pl.'s Mem. in Supp. of Mot. for J. on the Admin. R., Doc. No. 19-1, at 11-12.)  As Hartford points out, however, it had no obligation to demonstrate that Boyson's condition had changed; rather, under the terms of its policy, the claimant bears "continuing proof of disability."  (See Def.'s Mot. for J. on the Admin. R., Doc. No. 20, at 14); Admin. R. at 1252.  Pursuant to this requirement, Hartford's policy provides

---

her LTD benefits was unreasonable, it has no bearing on my analysis.

that "[the claimant] may be asked to submit proof that [she] continue[s] to be disabled and [is] continuing to receive appropriate and regular care of a doctor . . . as often as [Hartford] feel[s] [is] reasonably necessary."  Admin R. at 1252.

According to the First Circuit, "a claimant seeking disability benefits bears the burden of providing evidence that he is disabled <u>within the plan's definition</u>."  <u>Morales-Alejandro v. Med. Card Sys.</u>, 486 F.3d 693, 700 (1st Cir. 2007) (emphasis added) (finding that "[claimant] bore the burden of showing that he continued to be disabled, as defined in the Plan.").[9]  Where,

_____

[9] Boyson argues that the definition of disability under the Social Security Act should control here.  (<u>See</u> Pl.'s Reply Mem., Doc. No. 23, at 7.)  However, "to qualify for disability benefits under a plan, a claimant must satisfy the plan's definition of disability, not the definition of disability under the Social Security Act."  <u>Morales-Alejandro</u>, 486 F.3d at 699 (citing <u>Matias-Correa v. Pfizer, Inc.</u>, 345 F.3d 7, 12 (1st Cir. 2003)).  Social Security regulations, therefore "should not be given controlling weight except perhaps in the rare case in which the social security criteria are identical to the criteria set forth in the insurance plan."  <u>Id.</u> (citations omitted).  While Boyson argues that "the definition of disability under the Social Security Act is <u>not dissimilar</u>" to the definition of disability in Hartford's policy, she concedes that a "material difference" exists as to "what evidence is required and how disability is determined."  (<u>See</u> Pl.'s Reply Mem., Doc. No. 23, at 7-8 (emphasis added).)  Given this concession, I cannot conceive of how the two definitions are similar at all, let alone "identical."  <u>See Morales-Alejandro</u>, 486 F.3d at 699.  As such, Boyson has not shown that this is the rare case in which Social Security criteria would apply.

as here, the claimant bears the burden of continuously proving her disability under the terms of that plan, the record need not contain evidence that the claimant's medical condition changed. See id.; see also Doyle v. Liberty Life Assurance Co. of Boston, 542 F.3d 1352, 1362 (11th Cir. 2008) (finding that the plan administrator had no obligation to explain how claimant's condition had changed, where the burden fell on the claimant under the plan's policy to establish that she was entitled to LTD benefits).  As such, Boyson's argument that Hartford must demonstrate a change in her medical condition that supports its decision to terminate her LTD benefits is without merit.

**B.   Conflict of Interest**

Boyson argues that Hartford's structural conflict as a plan administrator that both adjudicates claims and pays benefits should be accorded significant weight in the court's analysis, but concedes that the existence of this conflict does not alter the standard of review.  (See Pl.'s Mem. in Supp. of Mot. for J. on the Admin. R., Doc. No. 19-1, at 10.)  Hartford does not dispute that a structural conflict of interest exists, but contends that it is entitled to little weight, and argues that it took steps to reduce the impact of any potential bias.  (See Def.'s Mot. for J. on the Admin. R., Doc. No. 20, at 11-14.)

-23-

As discussed above, "a conflict exists whenever a plan administrator, whether an employer or an insurer, is in the position of both adjudicating claims and paying awarded benefits." Denmark, 566 F.3d at 7 (quoting Metro. Life Ins. Co., 128 S. Ct. at 2348-50); see Section III.B, supra. That conflict, however, should be accorded significant weight in the court's abuse of discretion analysis only where there is a "higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." Metro. Life Ins. Co., 128 S. Ct. at 2351. Conversely, the conflict should be accorded little significance "where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." Id.; see also McGahey v. Harvard Univ. Flexible Benefits Plan, 260 F.R.D. 10, 12 (D. Mass. 2009) (explaining that other relevant considerations include "the thoroughness and consistency of the explanation of the denial; the care with which the claimant's own physician's opinions were treated; and, if the administrator relied on the opinion of

-24-

independent experts, the extent to which these experts were in fact truly independent") (citations omitted).  Boyson, as the party asserting an ERISA improper denial of benefits claim, bears the burden of showing that the conflict influenced Hartford's decision.  See Cusson, 592 F.3d at 225.

Boyson has not met that burden in this case.  Though Boyson alleges that Hartford's reliance upon the video surveillance conducted by its Special Investigations Unit demonstrates its bias in handling the processing of her claim, the First Circuit has approved of surveillance efforts by benefits claims reviewers.  (See Pl.'s Mem. in Supp. of Mot. for J. on the Admin. R., Doc. No. 19-1, at 11; Pl.'s Reply Mem., Doc. No. 23, at 9); see Cusson, 592 F.3d at 229 (finding that it was not inappropriate for claims reviewers to rely on video footage that contradicted the plaintiff's reports of limitations, as it is "permissible to require documented, objective evidence of disability").  The fact that Hartford relied on such objective evidence does not, in and of itself, demonstrate that its decision was improperly influenced by financial considerations.[10]

---

[10] Boyson concedes that she "does not argue that surveillance efforts should never be used as a tool in adjudicating disability claims," but contends that Hartford's summary of the surveillance video indicates bias.  (See Pl.'s

On the contrary, it appears that Hartford had every reason to initiate surveillance in order to resolve the inconsistency between the opinions of Dr. Stepro, who continued to insist that Boyson was incapacitated, and her physical therapist, who noted that Boyson was regaining strength and stamina such that she could likely return to work in a "sedentary to light" capacity. (See Def.'s Mot. for J. on the Admin. R., Doc. No. 20, at 6); Admin. R. at 54.

Hartford cites to several places in the record where it allegedly took steps to ensure that the processing of Boyson's claim was unbiased and accurate: its decision to continue to pay Boyson benefits pending investigation of her claim, the approval of the initial benefits denial by a second Hartford employee, the

---

Reply Mem., Doc. No. 23, at 9.)  By "summary," Boyson presumably refers to the written time line that narrates the contents of the surveillance video.  See Admin. R. at 563-66.  That narrative contains nothing more than an objective, time-stamped account of what the surveillance video depicts:  Boyson climbing three flights of stairs, walking across a parking lot, lifting two twelve-packs of soda, and standing in line for food stamps.  See id.  Furthermore, both Dr. Upadrasta and Dr. Turnbull, to whom Hartford sent this allegedly biased "summary," were also provided with a CD copy of the surveillance itself and a full transcript of the interview that Investigator Berger conducted.  See Admin. R. at 424, 427.  As such, Boyson's contention that the contents of the surveillance were "skewed to obtain the answers that [ ] Hartford was seeking" is without merit.  (See Pl.'s Reply Mem., Doc. No. 23, at 9.)

assignment of her claim on appeal to a unit separate from the
unit that made the initial claims determination, and its referral
of her claim to outside, independent vendors for peer review
medical reports.  (See Def.'s Mot. for J. on the Admin. R., Doc.
No. 20, at 13.)  None of these factors, in the absence of further
explanation, are particularly convincing.  See MacLeod v.
Reliance Standard Life Ins. Co., 2010 DNH 029, at 25-26 (refusing
to credit an insurer's argument that a structural conflict was
entitled to lesser weight where the insurer initially approved
the claim but "failed to demonstrate special efforts to separate
those individuals within the company who handled finances from
those who handle claims").  However, because Boyson has failed to
support her contention that Hartford was unduly influenced by its
dual position as claims adjudicator and purveyor of LTD benefits
with actual evidence of bias, the structural conflict retains
some weight, but is not accorded any additional weight in my
analysis.  See id.

## C.   Peer Review by Reliable Review Service ("RRS")

Boyson takes particular issue with the medical reports of
Dr. Goldman and Dr. Andrews, the RRS physicians to whom Hartford
submitted her file for additional, independent review.  (See

Pl.'s Mem. in Supp. of Mot. for J. on the Admin. R., Doc. No. 19-1, at 12; Section II.G, <u>infra</u>.)  First, Boyson alleges that both doctors misconstrued her medical history by noting that she had "fractured her Tibia on 3/20/04 in a motor vehicle accident and had surgery" and had "not worked since March 5, 2002," where the plaintiff was in fact injured in a skiing accident on March 20, 2004, required multiple surgeries, and ceased working on March 20, 2002.  (<u>See</u> Pl.'s Mem. in Supp. of Mot. for J. on the Admin. R., Doc. No. 19-1, at 13.)  Misstating the cause of Boyson's injuries is not the sort of error that would render a doctor's report unreliable, particularly where, as here, both Dr. Goldman and Dr. Andrews were asked to provide an evaluation "given the totality of the medical evidence."  <u>See</u> Admin. R. at 410, 412. Both reports, when read in their entirety, focus on the pertinent issue--whether Boyson was able to return to work following her injury--and both Dr. Goldman and Dr. Andrews cite to doctors' notes, examination results, and video surveillance observations that support their assessment of her functional capability.  <u>See</u> <u>id.</u>  Moreover, Dr. Goldman was exclusively tasked with evaluating Boyson's <u>psychiatric</u> functionality, not her physical pain.  <u>See</u> <u>id.</u> at 408.  Whether Boyson injured her knee in a skiing or motor

-28-

vehicle accident is clearly not material to that assessment.

Boyson also suggests that the records that RRS reviewed were incomplete.  (See Pl.'s Mem. in Supp. of Mot. for J. on the Admin. R., Doc. No. 19-1, at 12-13.)  Presumably, Boyson refers to one line in Dr. Goldman's report, in which he indicated that there were "no mental status examinations" in 2004 for him to review.  See Admin. R. at 408.  Even if the record did not contain the two "mini-mental status" reviews conducted in 2004, Dr. Goldman's report mentions more recent, and therefore more relevant,[11] mental status examinations that were conducted in 2005, 2006, and 2007.  See Admin. R. at 408-409.  Moreover, a claimant must not merely identify any information allegedly missing from the record; she must explain how that information "may have altered [the doctor's] conclusion."  Smith v. Blue Cross Blue Shield of Mass., Inc., 597 F. Supp. 2d 214, 223 (D. Mass. 2009).  As Boyson has failed to demonstrate that inclusion

---

[11] Hartford's LTD policy limits payment of benefits for disability due to a mental disorder of any type to 24 months following the 180 day Elimination Period.  See Admin. R. at 1250; Section II.A, supra.  A claimant is additionally under a continuing obligation to prove that she is disabled under the terms of Hartford's policy.  Boyson's mental status in 2004, therefore, would have only limited bearing on whether she was eligible for mental disability benefits in 2007.  See Admin. R. at 1252.

of these allegedly omitted examinations dating back to 2004 would have changed the outcome of Dr. Goldman's review, their absence does not undermine his report's ultimate conclusion.[12]  See id.

Finally, Boyson contends that both Dr. Goldman and Dr. Andrews failed to discuss medical evidence weighing in her favor. The First Circuit addressed this issue in Cusson v. Liberty Life Assurance, where the reports of independent medical reviewers failed to address certain documents that were favorable to the claimant.  See Cusson, 592 F.3d at 227.  Relying upon its prior holding in Tsoulas v. Liberty Life Assurance Co., 454 F.3d 69, 77 (1st Cir. 2006), the First Circuit upheld the district court's determination that "it would be improper for the court automatically to assume that unless the medical report lists each item the examiner reviewed, he or she did not review it." Cusson, 592 F.3d at 227.  Thus, even if Dr. Goldman and Dr.

---

[12] In an apparent attempt to question the completeness of RRS's review, Boyson argues that Doctors Goldman and Andrews "listed documents from an unknown source," as the records sent for review included "office visit notes" from Dr. Jacob Tom, whom Boyson allegedly does not know.  (Pl.'s Mem. in Supp. of Mot. for J. on the Admin. R., Doc. No. 19-1, at 12 n.3); see Admin. R. at 409.  First, neither Dr. Goldman nor Dr. Andrews relies upon these notes in the text of his report.  See Admin. R. at 408-13. Furthermore, Boyson fails to explain how their inclusion would have caused either doctor to alter his conclusion.

Andrews did not discuss each and every document that weighed in Boyson's favor, it does not necessarily mean that they failed to review those documents.

Furthermore, it does not appear that the independent review reports actually overlooked this allegedly favorable evidence. Boyson alleges that neither outside medical reviewer discussed her "ability or inability to concentrate, inability to get restful sleep," the fact that she had "told Dr. Upadrasta [on January 12, 2007] that she was crying every day because of the pain," or why they "discounted Dr. Stepro's opinion" that she could not return to work.  (See Pl.'s Mem. in Supp. of Mot. for J. on the Admin. R., Doc. No. 19-1, at 13.)  However, Dr. Goldman's report specifically noted places in the record where Boyson reported impaired sleep, appeared tired, revealed varying complaints of depression, and reported symptoms of poor focus, concentration and insomnia.  See Admin. R. at 408-09.  Dr. Andrews also discussed Boyson's history of insomnia and depression, and noted that Dr. Upadrasta was her treating internist.  See id. at 411-12.  It would be impractical if not impossible for a medical reviewer to discuss in detail each and every piece of a claimant's medical history in a single report;

-31-

the fact that Dr. Goldman and Dr. Andrews summarized that history does not mean that they failed to consider evidence favorable to Boyson.

Finally, it is unclear whether this allegedly overlooked medical evidence even weighed in Boyson's favor.  Although Boyson cites the opinion of Dr. Upadrasta as favorable evidence, Dr. Upadrasta actually agreed with Hartford's assessment that she was capable of returning to work in a sedentary capacity.  See Admin. R. at 426.  Boyson's allegation that the RRS doctors improperly "discounted Dr. Stepro's opinion" is equally unfounded.  Both Dr. Goldman and Dr. Andrews list numerous visit notes, reports, and correspondences with Dr. Stepro and his office, and Dr. Andrews actually spoke with Dr. Stepro himself.  See id. at 409, 411-12. In fact, Dr. Stepro confirmed at that time that he believed Boyson could work in a sedentary capacity if her physical knee injury were her only impairment.  See id. at 412.

Furthermore, even if the RRS doctors did "discount" Dr. Stepro's opinion, they were entitled to do so, as they need not "accord special weight to the opinions of [Boyson's] physician." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). Courts cannot "impose on plan administrators a discrete burden of

explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  Id.  The RRS doctors, therefore, were under no obligation to explain why they credited the video surveillance, reports of other physicians, and Hartford's functional assessment over Dr. Stepro's comment that he was "unsure of [Boyson's] ability to succeed in a job, even in a low demand job."  See Admin. R. at 408-12.

**D.   <u>Review on Appeal</u>**

Boyson alleges that Hartford's appeal process did not afford her file a full and fair review.  (See Pl.'s Mem. in Supp. of Mot. for J. on the Admin. R., Doc. No. 19-1, at 20-22.)  First, Boyson attacks the Peer Review Report of Dr. Kopacz, the independent MES Solutions physician to whom her file was submitted for review.  Boyson argues that "Dr. Kopacz's conclusions were based upon a faulty understanding of the facts"--specifically, that he mistakenly noted that Boyson "was seen sitting in the car for over an hour at a time," and "walking and standing for greater than 45 minutes at a time."  (See Pl.'s Mem. in Supp. of Mot. for J. on the Admin. R., Doc. No. 19-1, at 21.)

The First Circuit was recently confronted with this issue in <u>Cusson</u>, where a reviewing physician made several inaccurate

-33-

statements about surveillance data in his report.  See Cusson,
592 F.3d at 220-221.  There, though the report "overstated the
amount of time [the claimant] spent outside of her home on
certain days, sometimes by as much as a factor of three" the
court found that its "main substantive point about the
surveillance--that it showed [the claimant] engaged in activities
that she claimed she could not do--was accurate," and therefore
the report was reliable.  See id. at 221, 225.  Here, as in
Cusson, Kopacz's report correctly noted that Boyson was seen
engaging numerous activities that exceeded the scope of her
alleged restrictions: walking with a normal gait, easily entering
and exiting a car without assistive devices, and remaining
outside of her home for over five hours.  See Admin. R. at 216-
17.  Furthermore, while the video time line does not comport
exactly with the disputed observations in Kopacz's report, these
errors are relatively minor when compared with the inaccuracies
discussed, but found to be immaterial, in Cusson.  (See Admin. R.
at 216-17, 563-66); see Cusson, F.3d at 220.  Because the main
substantive point of Kopacz's report was accurate, it was not
improper for Hartford to credit that report when reviewing
Boyson's claim on appeal.  See Cusson, F.3d at 225.

Additionally, Boyson argues that Hartford violated ERISA's "full and fair review" requirements when it failed to provide her with a copy of Dr. Kopacz's report <u>before</u> the appeal review was completed.[13]  (<u>See</u> Pl.'s Mem. in Supp. of Mot. for J. on the Admin. R., Doc. No. 19-1, at 21); 29 C.F.R. § 2560.503-1(h) (setting forth requirements for appeal of adverse benefit determinations under ERISA).  A "full and fair review" under ERISA entitles a plaintiff "upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." 29 C.F.R. § 2560.503-1(h)(2)(iii).  Because Boyson was not provided with a copy of Dr. Kopacz's decision prior to Hartford's final denial of her appeal, and was therefore unable to comment on it, she argues that Hartford has violated its fiduciary obligations under ERISA.  <u>See</u> <u>id.</u>; <u>see also</u> 29 C.F.R. § 2560.503-1(h)(2)(ii).

While the relevant Code of Federal Regulations provisions do

---

[13] Boyson's counsel did receive a copy of the report after Hartford issued her final denial letter.  Upon receipt, Boyson's counsel requested reconsideration of her appeal, which Hartford denied.  (<u>See</u> Pl.'s Mem. in Supp. of Mot. for J. on the Admin. R., Doc. No. 19-1, at 21-22.)

entitle a claimant to copies of the documents upon which an insurer relied in denying her appeal, nowhere do they explicitly require that those documents be furnished <u>prior</u> to the determination itself.  <u>See</u> 29 C.F.R. § 2560.503-1(h)(2)(iii). This Circuit has found this "reasonable access" requirement to have been met when claim documents are mailed after a plan fiduciary's decision has been made.  <u>See</u> <u>Medina</u>, 588 F.3d. at 49.

Furthermore, while the First Circuit has not directly addressed the precise timing requirements for the provision of relevant documents on administrative appeal, other circuits have explicitly held that ERISA "does not require a plan administrator to provide a claimant with access to the medical opinion reports of appeal-level reviewers prior to a final decision on appeal." <u>Metzger v. UNUM Life Ins. Co. of Am.</u>, 476 F.3d 1161, 1167 (10th Cir. 2007); <u>see also</u> <u>Midgett v. Wash. Group Int'l Long Term Disability Plan,</u> 561 F.3d 887, 896 (8th Cir. 2009) (a claimant's rights under ERISA "[do] not include reviewing and rebutting, prior to a determination on appeal, the opinions of peer reviewers solicited on that same level of appeal."); <u>Glazer v. Reliance Standard Life Ins. Co.</u>, 524 F.3d 1241, 1245-46 (11th Cir. 2008) ("[R]equiring these documents to be produced earlier

-36-

would create 'an unnecessary cycle of submission, review, re-submission, and re-review.'") (internal citations omitted); Balmert v. Reliance Standard Life Ins. Co., No. 10a0094a.06, 2010 U.S. App. LEXIS 7111, at *13 (6th Cir. Apr. 6, 2010) (indicating that it was "dubious in light of the holdings of [other] circuits" that the claimant had a right to receive the report of a reviewing peer physician while her administrative appeal was still pending).  As such, Hartford was fully compliant with ERISA's "full and fair review" requirement when handling Boyson's claim, and Boyson has presented no evidence that indicates otherwise.

## F.   **Reasoned and Supported by Substantial Evidence**

Having addressed each of Boyson's arguments, I must now determine whether Hartford's decision to terminate her LTD benefits was "reasoned and supported by substantial evidence." See, e.g., Gannon v. Metro Life Ins. Co., 360 F.3d 211, 213 (1st Cir. 2004); Medina, 588 F.3d at 45.  Evidence is substantial so long as it is "reasonably sufficient to support a conclusion." Therefore, the only issue before the court is "whether the administrator's denial of benefits is irrational, with any doubts resolved in favor of the administrator."  Liston v. Unum Corp.

Officer Severance Plan, 330 F.3 19, 24 (1st Cir. 2003).  While
conflict of interest is one of several different issues that a
court must consider, "in the absence of aggravating circumstances
(say, evidence of arbitrariness or of actual bias)" it is not
dispositive.  Denmark, 566 F.3d at 8.  Since Boyson has not
demonstrated that Hartford's structural conflict as both
adjudicator of claims and purveyor of benefits actually
influenced its decision to terminate her LTD benefits, this
conflict will remain a factor, but will not be accorded any
additional weight in my analysis of whether Hartford's decision
was proper.  See Glenn, 128 S.Ct. at 2346; Cusson, 592 F.3d at
224-25; Section III.B, supra.

       Applying this deferential "arbitrary and capricious"
standard to the facts of this case, I must uphold Hartford's
decision "if there is any reasonable basis for it."  Morales-
Alejandro v. Med. Card Sys., 486 F.3d at 698 (quoting Madera v.
Marsh USA, Inc., 426 F.3d 56, 64 (1st Cir. 2005)).  Here, the
record clearly supports Hartford's decision to terminate Boyson's
LTD benefits.  The vast majority of the evidence--the
surveillance footage, investigator Berger's summary of his
interview with Boyson, and the opinions of Dr. Upadrasta, Dr.

Goldman, Dr. Andrews, and Dr. Kopacz--supports Hartford's conclusion that Boyson's injuries did not prevent her from engaging in "any occupation" for which she was qualified.  See Admin. R. at 340, 410, 426, 430, 533, 561-66, 1246.  In fact, the only evidence that seems to support Boyson's position is the opinion of Dr. Stepro, her treating orthopedist, who refused to review the surveillance footage.  See id. at 771, 803-804.  As this Circuit has repeatedly held, "the mere existence of contradictory evidence does not render a plan fiduciary's determination arbitrary and capricious," and a plan administrator is under no obligation to accept or give particular weight to the opinion of a claimant's treating physician.  Leahy, 315 F.3d at 19; see Vlass v. Raytheon Employees Disability Trust, 244 F.3d 27, 30 (1st Cir. 2001); Black & Decker, 538 U.S. at 834. Hartford was therefore under no obligation to credit Dr. Stepro's opinion, and its failure to do so was certainly not "irrational," particularly in lieu of the substantial, objective evidence that contradicted his assessment.  See Liston, 330 F.3d at 24.

## IV.   CONCLUSION

For all of the foregoing reasons, I grant Hartford's motion

for judgment on the administrative record (Doc. No. 20) and deny

Boyson's motion (Doc. No. 19).  The clerk is directed to enter

judgment and close the case.

     SO ORDERED.


                      /s/Paul Barbadoro
                      Paul Barbadoro
                      United States District Judge

May 7, 2010

cc:  Janine Gawryl, Esq.
     Byrne J. Decker, Esq.